AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Information about Facebook account 100073832053895
that is stored at premises controlled by Meta Platforms,
Inc., 1 Meta Way, Menlo Park, CA 94025

)
)
)
)
)
)

Case No.    **25mr1009**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated by reference herein.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | Distribution and Conspiracy to Distribute Controlled Substances |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime |
| 18 U.S.C. § 922(n) | Prohibited Person in Possession of a Firearm and Ammunition |

The application is based on these facts:

See attached affidavit, incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Gavin Hayes, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephonically sworn and electronically signed_____ *(specify reliable electronic means)*.

Date:    6/4/2025

_____
*Judge's signature*

City and state:   Albuquerque, New Mexico

The Hon. Steven C. Yarbrough, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT 100073832053895 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC., 1 META WAY, MENLO PARK, CA 94025 | Case No. _____<br><br>**Filed Under Seal** |

**AMENDED AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Gavin Hayes, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Facebook account that is stored at premises owned,

maintained, controlled, or operated by Meta Platforms, Inc., 1 Meta Way, Menlo Park, CA

94025 ("Meta"), a company headquartered in Menlo Park, California.  The information to be

searched is described in the following paragraphs and in Attachment A.  This affidavit is made in

support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A) to require Meta to disclose to the government records and other information in its

possession, pertaining to the subscriber or customer associated with account 100073832053895,

henceforth referred to as "SUBJECT ACCOUNT".  Upon receipt of the information described in

Section I of Attachment B, government-authorized persons will review that information to locate

the items described in Section II of Attachment B.

2.      I am a Special Agent with the Department of Homeland Security, Homeland

Security Investigations, hereafter referred to as HSI, and have been employed by HSI since

August of 2023. I am currently assigned to the HSI office in Albuquerque, NM, where I am assigned to investigate individuals involved in the trafficking of narcotics including violations of Title 21, United States Code, Section 841 and 846. I have worked narcotics investigations and have training in investigating these types of cases by the Department of Homeland Security and other governmental and non-governmental entities. During the investigation of these cases, I have participated in the execution of search warrants pertaining to these violations.

3.      I have completed the Criminal Investigators Training Program (CITP) and Homeland Security Investigations Special Agent Training (HSISAT) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. These training programs included topics such as constitutional law, customs and immigration law, civil and criminal forfeiture, narcotics investigations, financial investigations, physical and electronic evidence, investigative methods, and more.

4.      Prior to my tenure as a Special Agent, I was a sworn law enforcement officer employed by the city of Greensboro, North Carolina. I served in that position for over 6 years, during which I was primarily assigned to the patrol bureau. My primary responsibilities were responding to 911 calls and investigating violations of criminal law. I investigated and assisted with investigating hundreds of felony and misdemeanor violent crimes, drug offenses, weapon violations, fraud offenses, impaired driving offenses, and more. I regularly established probable cause for warrantless arrests, arrest warrants, and search and seizure warrants for the aforementioned crimes.

5.      My training as a Greensboro Police Officer included attending the Greensboro Police Academy, which included North Carolina's Basic Law Enforcement Training (BLET) program. Covered topics included constitutional law, criminal law, patrol duties, basic narcotics

2

investigations, criminal investigations, basic interviewing, communication, and mental health awareness.

6.  Prior to my tenure as a Greensboro Police Officer, I received my education at Elon University in North Carolina. I received a Bachelor of Arts with majors in Public Health Studies and Policy Studies, and minors in Leadership Studies and Criminal Justice Studies.

7.  In addition to my training and experience, I have developed information I believe to be reliable from additional sources including, but not limited to:

    a.  Information provided by Special Agents ("SA"), Criminal Analysts ("CA") of the Department of Homeland Security, and other law enforcement officials (collectively referred to as "agents"), including oral and written reports that I have received directly or indirectly from said investigators;

    b.  Sources of Information (SOIs) ;

    c.  Results of physical surveillance conducted by agents during this investigation;

    d.  A review of telephone subscriber information;

    e.  A review of driver's license and automobile registration records;

    f.  Records from commercial databases;

    g.  Records from the National Crime Information Center ("NCIC"); and

    h.  Court-authorized intercepted communications.

8.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846, as well as 18 U.S.C. §§ 922(n) and 924(c), have been committed by Gabriel James CERVANTES using Facebook account 100073832053895.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

10.      The United States, including HSI, is conducting a criminal investigation of CERVANTES and other known and unknown individuals involved in his Transnational Criminal Organization ("TCO").

11.      In February 2024, HSI Special Agent ("SA") Beckford learned from New Mexico State Police ("NMSP") that CERVANTES was a known seller of fentanyl pills in Albuquerque and Santa Fe, New Mexico. NMSP advised they purchased fentanyl pills from CERVANTES on six previous occasions utilizing a NMSP undercover agent ("UCA"). NMSP had communicated with the SUBJECT ACCOUNT to arrange the purchase of fentanyl pills.

12.      A criminal history check on CERVANTES identified he was on state probation for aggravated assault with a deadly weapon. I reviewed a judgement and sentence document that showed, on July 27, 2023, CERVANTES was sentenced in New Mexico state court for his convictions on two counts of aggravated assault (deadly weapon). Each of those counts was punishable by up to 18 months' imprisonment. CERVANTES was granted a conditional discharge and proceedings were deferred for a period of three years. Therefore, I have probable cause to believe that CERVANTES, who was still on state supervised probation and the aforementioned conditional discharge at all relevant times, was a person under indictment

13.     Through communication with the NMSP UCA, SA Beckford learned CERVANTES's current address is identified as 1338 Gonzales Rd., SW, Albuquerque, New Mexico.

14.     In January of 2024, the NMSP utilized a UCA Facebook account and viewed a Facebook account named "James Cervantes" with an account ID of 100073832053895. The SUBJECT ACCOUNT was advertising "boats" of narcotics for sale. "Boats" is a street slang term that narcotic dealers use referencing the pill count they are selling; a "Boat" is one thousand fentanyl pills. The NMSP UCA communicated with the SUBJECT ACCOUNT to arrange the purchase of 1,000 fentanyl pills for $1,250.00. When the NMSP UCA arrived at the arranged location, they communicated with the SUBJECT ACCOUNT and conducted the narcotics transaction. The person the NMSP UCA met with resembled the social media pictures associated with the SUBJECT ACCOUNT. The purchased pills presumptively tested positive for fentanyl and weighed 106.8 gm.

15.     In January of 2024, the NMSP utilized a UCA Facebook account and viewed a message which included the "James Cervantes" account. The SUBJECT ACCOUNT was advertising the private sale of firearms.

16.     Through the use of various intel/ law enforcement sources, the person the NMSP UCA met with was identified as Gabriel James CERVANTES, with a date of birth of December 09, 1996, SOC: 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, New Mexico Driver license #511746302. With this information, the NMSP UCA conducted a New Mexico motor vehicle inquiry and received a driver's license return for Gabriel CERVANTES. Using the photograph returned, the NMSP UCA positively identified Mr. Gabriel James Cervantes as "James Cervantes" and as the male I met at the address for the narcotics transaction, as well as the person with whom I completed this narcotic

exchange. His driver's license picture resembles his pictures on social media and public forums. The vehicle in which CERVANTES arrived at the narcotic transaction is also registered to CERVANTES.

17.     In February 2024, the NMSP UCA communicated with CERVANTES via the SUBJECT ACCOUNT to conduct a narcotics transaction of suspected fentanyl pills. On February 22, 2024, CERVANTES met with the UCA at an agreed upon location in Albuquerque, NM, and to sell the UCA fentanyl pills. Prior to the deal, NMSP Officer Isaiah Taylor observed a male subject exit the residence at 1338 Gonzales Rd SW and enter the Ford F-150. Region 3 Narcotics Task Force ("Region 3") officers followed the Ford F-150 to the deal location. SA Beckford observed the Ford F-150 enter the parking lot of the deal and observed that CERVANTES was driving the Ford F-150.  After the deal, CERVANTES drove the Ford F-150 directly back to 1338 Gonzales Rd SW. The NMSP UCA reported that CERVANTES sold them 771 grams of suspected fentanyl pills, which were bundled in a plastic saran wrap coated with an unknown brown substance. The suspected fentanyl pills were blue in color, circular in shape, and were marked "M/30." The suspected fentanyl pills were presumptively tested by an HSI seized property specialist and the substance tested positive for fentanyl.

18.     In March 2024, the NMSP UCA communicated with CERVANTES via the SUBJECT ACCOUNT to conduct a narcotics transaction of suspected fentanyl pills. On March 14, 2024, CERVANTES met with the UCA at an agreed upon location in Albuquerque, New Mexico and sold them approximately 637 grams of suspected fentanyl pills. The suspected fentanyl pills were blue in color, circular in shape, and were marked "M/30." The suspected fentanyl pills were presumptively tested by an HSI seized property specialist and the substance tested positive for fentanyl.

19.    In March 2024, the NMSP UCA communicated with CERVANTES via the SUBJECT ACCOUNT to conduct a narcotics transaction of suspected fentanyl pills. On March 29, 2024, CERVANTES met with the UCA at an agreed upon location in Albuquerque, New Mexico and sold them approximately 1244 grams of suspected fentanyl pills. The suspected fentanyl pills were blue in color, circular in shape, and were marked "M/30." The suspected fentanyl pills were presumptively tested by an HSI seized property specialist and the substance tested positive for fentanyl.

20.    On April 15, 2025, through static electronic surveillance, Agents observed a white and black Cadillac XTS bearing NM UNM51027 registered to Manuel GUTIERREZ arriving at the PREMISES. CERVANTES exited the PREMISES with no shirt, grey gym shorts, white socks and Nike slide style sandals.  CERVANTES met the Cadillac driver identified as GUTIERREZ from his New Mexico Driver's license. GUTIERREZ opened the truck of the Cadillac and CERVANTES retrieved a tan canvas firearms case with a tan strap.  CERVANTES and GUTIERREZ then entered the PREMISES.  CERVANTES was observed carrying the tan firearms case.

21.    Approximately twenty-five (25) minutes later, SA R. Sanders, utilizing an undercover Facebook profile, observed CERVANTES post four (4) pictures advertising an AR-15 pattern rifle in a group Facebook message.  Included with the pictures was a comment that the AR-15 was equipped with a "seekins precision binary trigger."[1]  The tan rifle case and strap were visible in the photos, which are listed below:

---

[1] According to information provided by ATF SA Garica, a "binary trigger" is a legal modification to an AR-15 pattern rifle permitting the rifle to fire two (2) rounds with each trigger pull.  As the rifle operator pulls the trigger to



the rear a round is fired, once the trigger is released a second shot is discharged.  This utilizes the AR-15 semi-automatic fire mechanism and is not defined as fully automatic fire.

22.     After March 2024, HSI conducted additional purchases of fentanyl pills from CERVANTES. For these purchases, communication was through SMS text messages and phone calls. However, the purchases, including the most recent on April 9, 2025, show that CERVANTES was actively trafficking narcotics. Open source information shows that the SUBJECT ACCOUNT has not been deleted or deactivated.  I know, based on my training and experience, that the SUBJECT ACCOUNT may have continued to receive messages from other drug traffickers—including messages from the group in which the SUBJECT ACCOUNT was a member.

23.     On April 17, 2025, HSI Agents arrested CERVANTES based on a criminal complaint for violations of 21 U.S.C § 841. In May of 2025, a Grand Jury in the District of New Mexico returned an Indictment for CERVANTES, charging him with violations of three counts of 21 U.S.C § 841, one count of 21 U.S.C. § 846, and one count of 18 U.S.C. § 924(c).

24.     On April 16, 2025, I submitted a records preservation request to Meta, to preserve the records and account details associated with the SUBJECT ACCOUNT. Meta responded and indicated the data associated with the SUBJECT ACCOUNT has been preserved, and provided a case number of 9449347.

## BACKGROUND CONCERNING FACEBOOK[2]

25.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

26.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

27.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

---

[2] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

28.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

29.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

30.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

31.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content

unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

32.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

33.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

34.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

35.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

36.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

37.    In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

38.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

39.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

40.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence.  For example, profile contact information, private messaging logs, status updates, and

tagged photos (and the data associated with the foregoing, such as date and time) may be

evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook

account activity can show how and when the account was accessed or used.  For example, as

described herein, Meta logs the Internet Protocol (IP) addresses from which users access their

accounts along with the time and date.  By determining the physical location associated with the

logged IP addresses, investigators can understand the chronological and geographic context of

the account access and use relating to the crime under investigation.  Such information allows

investigators to understand the geographic and chronological context of Facebook access, use,

and events relating to the crime under investigation.  Additionally, location information retained

by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook

account activity may provide relevant insight into the Facebook account owner's state of mind as

it relates to the offense under investigation.  For example, information on the Facebook account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort

to conceal evidence from law enforcement).

42.    Therefore, the servers of Meta are likely to contain all the material described

above, including stored electronic communications and information concerning subscribers and

their use of Facebook, such as account access information, transaction information, and other

account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43.    I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

44.    Based on the foregoing, I request that the Court issue the proposed search warrant.

45.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

46.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

47.    This affidavit was reviewed and approved by AUSA David Hirsch.

Respectfully submitted,

Gavin Hayes
Special Agent
Homeland Security Investigations

Telephonically sworn and electronically signed on June 4, 2025.

UNITED STATES MAGISTRATE JUDGE

15

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with Facebook account 100073832053895 that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from January 1, 2025 to the Present;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them January 1, 2025 to the Present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook

applications;

(e)     All records or other information regarding the devices and internet browsers

associated with, or used in connection with, that user ID, including the hardware

model, operating system version, unique device identifiers, mobile network

information, advertising ID, and user agent string;

(f)     All other records and contents of communications and messages made or received

by the user January 1, 2025 to the Present, including all Messenger activity,

private messages, chat history, video and voice calling history, and pending

"Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook

posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account January 1, 2025 to the

Present;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any
payments associated with the service (including any credit card or bank account
number);

(p)     All privacy settings and other account settings, including privacy settings for
individual Facebook posts and activities, and all records showing which Facebook
users have been blocked by the account;

(q)     Records of any Facebook accounts that are linked to the account by machine
cookies (meaning all Facebook user IDs that logged into Facebook by the same
machine as the account); and

(r)     All records pertaining to communications between Meta and any person regarding
the user or the user's Facebook account, including contacts with support services
and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 10
days of issuance of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841 and 846, as well as 18 U.S.C. §§ 922(n) and 924(c), involving Gabriel James CERVANTES between January 1, 2025 and the Present, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)      The sale of illegal drugs and firearms, communications between CERVANTES and other members of his Drug Trafficking Organization, preparatory steps taken in furtherance of the scheme, evidence of financial transactions related to illegal drug sales.

(b)      Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)      Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)      The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC</u> <u>RECORDS PURSUANT TO FEDERAL RULES OF</u> <u>EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

b. such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

5

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                     Signature